REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 761

September Term, 2013

_____

LAURIE BURR

v.

MARYLAND STATE RETIREMENT AND
PENSION SYSTEM OF MARYLAND

_____

Berger,
Nazarian,
Reed,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: May 1, 2014

Laurie Burr, a former employee of Maryland's Administrative Office of the Courts, endured a difficult struggle with cancer while continuing to work, mostly from home. On August 27, 2007, she went to the office to meet with her supervisor; her health had improved, although not yet to the point where she had returned fully to work, and she understood the purpose of the meeting was to discuss her schedule and leave and assignments. Instead, she alleged (and, for purposes of this appeal, the Trustees of the Maryland State Retirement and Pension System (the "Trustees" of the "System") don't dispute), that her supervisor reduced the hours on her timesheet for work she had done, retroactively revoked her telework agreement, removed her from an important project she had led, reassigned her to "busywork," and demanded that she return to work in person before her doctors cleared her. She contended that these unexpected and obviously negative personnel decisions precipitated a sudden decline in her mental health and caused her to become suicidal. She has never returned to work, and everyone agrees that she is permanently disabled.

The question for us is whether she was disabled by an "accident." When she applied to the System for disability retirement benefits, Ms. Burr argued that the events of the August 27, 2007 meeting were *so* surprising to her that they qualified as an "accident," and thus that she was entitled to an accidental disability retirement allowance under Md. Code (1993, 2009 Repl. Vol.), § 29-109(b) of the State Personnel and Pensions Article ("SP"). The Trustees disagreed and approved an "ordinary" disability retirement. An Administrative Law Judge ("ALJ") and the Circuit Court for Anne Arun-

del County upheld the Trustees' decision, and Ms. Burr appeals. We hold that personnel decisions, even decisions that are surprising, cannot, as a matter of law, qualify as disabling "accidents," and we affirm the Trustees' decision to deny Ms. Burr's application for accidental disability benefits.

## I. BACKGROUND

Ms. Burr was hired as a Technical Business Analyst for the Maryland State Judiciary's Administrative Office of the Courts ("the AOC") in 2001. By all accounts, she was a good and competent employee, and she appears to have had a substantial role in the Judiciary's evolution toward electronic filing. The record reveals that she received strong performance reviews, and there is no issue in this case about her job performance, her eligibility to retire, or that she is permanently disabled. The only issue before us is the nature of her disability retirement, and specifically whether the events that caused her disability qualify her for an accidental disability retirement allowance which, if awarded, would yield a higher allowance than the ordinary retirement benefits that the Trustees already awarded her.

In October 2006, Ms. Burr was diagnosed with breast cancer. The AOC allowed her to work from home over the course of her treatment, and, as the summer of 2007 came to a close, she finished chemotherapy and contemplated easing into a schedule that would transition her back to working in the office. Her illness consumed all of her accumulated leave, and she drew both on leave available to her under the Family and Medical Leave Act ("FMLA") and a Judiciary leave bank. But according to a letter from her

2

supervisor, Charles Moulden, dated August 23, 2007, that she received by certified mail the next day, Ms. Burr had exhausted all available leave, and the Judiciary's Human Resources Office "directed that [Ms. Burr] return to work fulltime, immediately." This letter also stated, though, that in light of the "nature and totality of the circumstances," Ms. Burr was not actually required to come back full time until September 12, 2007. To Ms. Burr, the letter was a "surprise," but "she did not become psychologically damaged" as a result of reading it.

Ms. Burr had planned already to go to the office the following Monday, August 27, to meet with her supervisors, complete her timesheet, and discuss the logistics of her return to work in light of "her medical doctors' requirements for [a] flex plan." When she arrived, she had an email waiting from Mr. Moulden saying that he wanted to meet with her and her other supervisor at 1:30 p.m. "to discuss work assignments and leave." No surprise there.

But the meeting itself went differently than the one-line request might suggest or than Ms. Burr expected. According to Ms. Burr, Mr. Moulden informed her that her telework agreement would be revoked retroactive to August 15, 2007, a decision that contradicted the statement in his letter from four days earlier. Ms. Burr discovered that Mr. Moulden had already completed her timesheet, without seeking her input or consulting her, and credited her with only four hours' work each day rather than the full eight hours. Mr. Moulden also removed her from the project she had been leading and directed her to begin full-time, in-office "busywork" immediately, "without exception," and told

3

her that she had exhausted all medical leave. Ms. Burr felt certain at that time that she had not in fact exhausted her leave and that her doctors would not clear her to return to work under these conditions; in fact, at that point, they had not cleared her to return at all.

In an "Employee's Report of Injury" (the "Injury Report") dated May 1, 2008, Ms. Burr explained that after the meeting, she suffered a "memory blackout," and the next thing she remembers is visiting her neighbors that evening. She returned home and determined that she was going to end her life. Instead, she fell asleep, called in sick the next morning, and kept a regularly-scheduled appointment with her psychologist, Benna Sherman, that afternoon. At Dr. Sherman's urging, Ms. Burr admitted herself to Baltimore-Washington Medical Center, and later was hospitalized at Sheppard Pratt. She never returned to her job with the AOC.

On July 2, 2008, Ms. Burr filed a Statement of Disability (the "Statement"), the document that served as her application for disability retirement benefits. In the Statement, she characterized her disability as *both* "Ordinary" and "Accidental," and she referred back to the Injury Report in the section of the Statement that called for a description of the "accident." On its first review, the State Retirement Agency (the "Agency") determined (in a letter sent to Ms. Burr from a counselor in the Disability Unit on July 10, 2008) that Ms. Burr's claim was "not compensable as an accidental injury as defined by the Maryland retirement law," and that her claim for accidental disability retirement benefits would be denied. On July 23, 2008, the Medical Board to the Agency recommended that she be approved for "*ordinary disability* due to a psychiatric condition"

4

(emphasis added), but recommended that the Trustees deny her accidental disability claim, and the Trustees adopted that recommendation on August 19, 2008. On December 11, 2008, Ms. Burr accepted the ordinary disability award, but opted to pursue her accidental disability claim. After reviewing the Medical Board's recommendation and the report of an independent psychiatrist who examined Ms. Burr, the Trustees again denied Ms. Burr's claim on August 8, 2009.

On December 8, 2009, Ms. Burr's counsel sought a hearing before a judge, and an administrative appeal through the Office of Administrative Hearings followed. The Trustees filed a motion for a "summary decision"[1] on September 12, 2011, arguing that the events of August 27, 2007, did not constitute an "accident" under SP § 29-109(b)(1). Ms. Burr opposed the motion on September 22, 2011, and sought a summary decision that her injury *did* arise from an accident, *i.e.*, the "sudden and unusual occurrence" that took place at the meeting. The ALJ held a hearing on October 5, 2011, and issued a Proposed Decision on November 3, 2011, that concluded that the Agency was entitled to judgment—even crediting Ms. Burr's account of the meeting and the interaction between her and Mr. Moulden, the ALJ decided, the events of the meeting were "general conditions of employment and [did] not fit within any common sense meaning of the term

---

[1] A "summary decision" plays the same procedural role in the disability application and review context as a motion for summary judgment in a circuit court civil action. *Assateague Coastkeeper v. Md. Dep't of the Envt.*, 200 Md. App. 665, 698-99 (2011).

5

accident." Ms. Burr filed exceptions to the Proposed Decision and, after a hearing, the Trustees adopted the ALJ's decision on June 21, 2012.

Ms. Burr then filed a Petition for Judicial Review in the Circuit Court for Anne Arundel County. The circuit court held a hearing on February 4, 2013, and affirmed the Trustees' decision in a Memorandum Opinion and Order on May 17, 2013. Ms. Burr filed a timely notice of appeal.

## II. DISCUSSION

Ms. Burr synthesizes the ultimate question before us well in her brief:[2] "If this Court determines that 'accident,' as a matter of law, cannot include a meeting between a supervisor and employee . . . , then the ALJ and Circuit Court [decisions] must be affirmed." We will say it slightly differently, but with the same effect: we affirm the Trustees' decision because a supervisor's personnel decisions cannot constitute an "accident"

---

[2] Ms. Burr lays out the issues more specifically in the following questions she presents:

I.    Whether disputes of material fact existed and the State's summary decision/judgment motion should have been denied.

II.    Whether the word "accident" in Md. Code Ann., [SP] § 29-109(b) means "unforeseen and unplanned event or circumstance" and the ALJ and Circuit Court erroneously interpreted the accidental disability pension statute.

III.    Whether the substance of what occurred during the meeting of August 27, 2007, was unforeseen, unplanned, and unexpected constituting an "accident" under the pension statute.

6

for purposes of determining an employee's right to accidental disability benefits. Our decision does not turn on whether Ms. Burr was surprised by or foresaw the decisions her supervisors conveyed to her in the August 27, 2007 meeting—we assume for present purposes that she was totally ambushed and that her supervisors' decisions wrongly interpreted and applied State personnel rules to her situation. Our holding stems instead from the indisputable fact that a supervisor's personnel decisions, whatever their character and however they were delivered, are a foreseeable part of a person's employment with the State, and, therefore, cannot constitute an "accident." Personnel decisions also are not unexpected occurrences (in any objectively determinable way), nor are they physical events or circumstances that can comprise an "accident."

On appeal, we look through the circuit court's decision to review that of the Trustees, although here, as a practical matter, there is no difference between the two. *See Barson v. Md. Bd. of Physicians*, 211 Md. App. 602, 612 (2013). We review that decision *de novo* to determine whether the Trustees decided correctly that the System was entitled to judgment as a matter of law. *Eng'g Mgmt. Servs., Inc. v. Md. State Highway Admin.*, 375 Md. 211, 229 (2003). We construe all facts in favor of Ms. Burr as the non-moving party, and we "'independently review the record to determine whether the parties properly generated a dispute of material fact and, if not, whether the moving party is entitled to judgment as a matter of law.'" *Suder v. Whiteford, Taylor & Preston, LLP*, 413 Md. 230, 239 (2010) (quoting *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 479 (2007) (internal citations and quotation marks omitted)). And we decide legal questions for ourselves,

7

although "a *degree* of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Bd. of Physician Quality Assur. v. Banks*, 354 Md. 59, 69 (1999) (emphasis added); *McCullough v. Wittner*, 314 Md. 602, 612 (1989) ("The interpretation of a statute by those officials charged with administering the statute is . . . entitled to weight."); *Wallace H. Campbell & Co. v. Md. Comm'n on Human Rels.*, 202 Md. App. 650, 670 (2011) ("Even though an agency's interpretation of a statute the agency is charged with enforcing is entitled to deference, that deference is not limitless.").

A disabled State employee is entitled to an accidental retirement allowance if she is disabled by an on-the-job accident:

> (b) [T]he Board of Trustees shall grant an accidental disability retirement allowance to a member if:
>
> (1) the member is totally and permanently incapacitated for duty *as the natural and proximate result of **an accident** that occurred in the actual performance of duty at a definite time and place* without willful negligence by the member; and
>
> (2) the medical board certifies that:
>
> > (i) the member is mentally or physically incapacitated for the further performance of the normal duties of the member's position;
> >
> > (ii) the incapacity is likely to be permanent; and
> >
> > (iii) the member should be retired.

SP § 29-109(b) (emphases added). Because there is no dispute (for purposes of reviewing the grant of a summary judgment motion, that is) that Ms. Burr was totally and permanently incapacitated as a natural and proximate result of what happened in the meeting of August 27, 2007, this case rises or falls entirely on whether the personnel decisions conveyed to her in that meeting qualify as an "accident."

Ms. Burr argues that the question is one of first impression for Maryland appellate courts and that the accident here, in light of the dictionary definition of the word, consists of the "unforeseen and unexpected" decisions that Mr. Moulden conveyed to her in the August 27 meeting, which caused Ms. Burr serious psychological injury and caused her to begin having suicidal thoughts. She claims that the ALJ erred by requiring that an accident involve "physical violence," and that the circuit court erred when it imposed a requirement that the employee undergo "some type of strain or exertion." She argues that Maryland cases compel us to construe "accident" to include the events of this meeting because we have previously permitted recovery for psychological harm without accompanying physical harm. And finally, she cites cases from outside of Maryland that, she claims, support her argument. For its part, the Agency argues that the dictionary definition of "accident" does not include this sort of injury and that none of the cases on which Ms. Burr relies construes an "accident" in a similar disability retirement context.

We start with the familiar principle that "'the cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.'" *Holbrook v. State,* 364 Md. 354, 364 (2001) (quoting *In re Anthony R.,* 362 Md. 51, 57 (2000)). We look at the

9

outset to the statute's plain language, *id.* at 364, and, if it is unambiguous "when construed according to its ordinary and everyday meaning, then this Court 'will give effect to the statute as it is written.'" *Motor Vehicle Admin. v. Jones*, 380 Md. 164, 175 (2004) (quoting *Pak v. Hoang,* 378 Md. 315, 323 (2003)). We look beyond the language of the statute only if we find an ambiguity, *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.,* 377 Md. 471, 483 (2003), and because we find no such ambiguity here, we need not look to further rules of statutory interpretation.

The statute does not define the word "accident," but dictionaries tie its meaning consistently to the foreseeability—or, more to the point, the non-foreseeability—of the event in question:

> **1**
> **a :** an <u>unforeseen</u> and <u>unplanned</u> event or circumstance
> **b :** lack of intention or necessity **:** CHANCE <met by *accident* rather than by design>
> **2**
> **a :** an unfortunate event resulting especially from carelessness or ignorance
> **b :** an <u>unexpected</u> and medically important bodily event especially when injurious <a cerebrovascular *accident*>
> **c :** an <u>unexpected happening</u> causing loss or injury which is not due to any fault or misconduct on the part of the person injured but for which legal relief may be sought.

*Merriam-Webster's Collegiate Dictionary* 7 (11th ed. 2011) (underlines added); *see also* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 12 (3d ed. 2011) (defining an accident as "an unforeseen event involving an injury or loss that ranges from slight (*e.g.*, spilling a drop from a tepid cup of water) to grave (*e.g.*, running a cruise ship into an

10

iceberg)"); *Webster's Third New International Dictionary* (2002) (defining an accident as "an event or condition occurring by chance or arising from unknown or remote causes"); *Black's Law Dictionary* 16 (9th ed. 2009) (defining an accident as "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated," and making the distinction that "[a] result though unexpected, is not an accident; the *means or cause must be accidental*" (emphasis added)). And the dictionary's synonyms (where the term "accident" is defined as "a chance event bringing injury, loss or distress") include "casualty, misadventure, mischance, and mishap," with related words including "calamity, catastrophe, disaster, tragedy[, and] misfortune," among others. *Webster's Collegiate Thesaurus* 8 (1978).

Several threads emerge from these definitions. *First*, an event's status as an accident depends not on the victim's *subjective* expectation that it will happen, but its *objective* foreseeability. *Second,* an accident happens unintentionally—maybe, as the dictionaries recognize, as a result of carelessness or negligence, but not as the result of an intentional act. Someone who drives every day to work knows that she might be rear-ended, but there is no objective reason to expect a fender-bender during a given morning or evening commute. If another driver hit her intentionally, that collision would not be an accident; if traffic slowed suddenly and a distracted driver hit her bumper, that collision

11

would be.[3]  Similarly, employees should expect meetings at work to involve presentations or discussions, even awkward or difficult or confrontational ones. But no employee expects a three-ton beam from an adjacent construction project to crash into the room—assuming, of course, that nobody intended the beam to break loose, that event is an accident. *See Belcher v. T. Rowe Price Found.*, 329 Md. 709, 714 (1993).

*Finally*, the definitions all include some physical *event* that takes place that precipitates harm. And although we agree with Ms. Burr that the event need not necessarily involve violence, we have not found any cases supporting the proposition that an accident can be caused by conversation, even an unpleasant one, without some tangible physical occurrence. *Belcher* presents the most obvious example. Ms. Belcher suffered only psychological injury (for which the Court of Appeals held she could recover[4]) after a steel beam fell from a nearby construction project into her office area without hitting her or causing her any physical injury. *Id.* at 713. The *occurrence* of the beam crashing through the ceiling was the piece of the equation that, as the definitions of "accident" put it, was "unforeseen and unplanned," and an "unexpected happening."[5]

---

[3] We offer this example purely for the purpose of illustrating accidents, not to offer views about the potential tort liability of an intentional or distracted driver.
[4] The Court held for the first time that an accident can cause compensable psychological injuries, at least for purposes of the Workers' Compensation law, even in the absence of any physical injury. *Belcher*, 329 Md. at 745-46.
[5] For what it's worth, the result there *could* fairly be characterized as violent—a witness described it "as if a bomb had exploded." *Belcher*, 329 Md. at 713.

Throughout her brief, Ms. Burr describes the operative event in fairly general terms, *e.g.*, as "the events of August 27, 2007." When we dig a little deeper, though, we see that her surprise came not from the mere fact of the meeting with her supervisor—by her own reckoning, she expected to meet with him all along—but from the personnel decisions that he conveyed to her during that meeting. Again, we assume for present purposes that she was, in fact, surprised by Mr. Moulden's decision to complete her timesheet with reduced credits, by his statement that she had exhausted her leave and needed to return full-time to work immediately, by his retroactive revocation of her telework agreement, and by his decision to remove her from her important project. We assume as well that her surprise from these decisions caused her disabling psychological illness. Even so, these decisions were not accidents. They were (and we track the elements of the definition we gleaned above) (1) intentional (and fairly run-of-the-mill) personnel actions by Ms. Burr's superiors, that (2) include the *kinds* of decisions (*i.e.*, decisions regarding scheduling, telework, and work assignments) that State employees can objectively expect, and that (3) did not involve any sort of physical and tangible force. Accordingly, we hold that these events cannot qualify as an "accident" that entitles her to an accidental disability retirement allowance.

We agree with Ms. Burr that she raises a question of first impression, but we disagree with her analysis of the cases she cites to support her position. Among others, she misreads language in *Harris v. Bd. of Educ.*, 375 Md. 21 (2003), another Workers' Compensation case, to argue that we should focus on the character of the resulting injury

13

rather than the activity that caused the injury. *See id*. at 36 ("[W]hat must be unexpected, unintended, or unusual is the *resulting injury and not the activity out of which the injury arises.*" (Emphasis added.)). In fact, *Harris* interpreted the phrase "accidental personal injury" in a different context, one in which the act causing the injury must occur *in the normal course* of the plaintiff's employment. Indeed, *Harris* overruled cases that required plaintiffs to prove that the activity begetting their injury was "unusual," a construction that limited workers' recovery in a paradigm that is avowedly remedial and "'construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes," and in which "[a]ny uncertainty in the law should be resolved in favor of the claimant.'" *Id.* at 57 (quoting *Baltimore v. Cassidy*, 338 Md. 88, 97 (1995)). The statutory paradigm here requires exactly the opposite:  the word "accident" stands alone in the statute, not as an adjective for "personal injury," and defines a circumstance that distinguishes a disability from an "ordinary" disability retirement. So whereas *Harris* reoriented the workers' compensation cases to *include* injuries suffered in the normal course in the compensatory scheme, it actually reinforces the intentional *difference* between foreseeable and easily anticipated employer-employee interactions and true accidents in the context of disability retirements.

We recognized this same structural distinction in *Eberle v. Baltimore County*, 103 Md. App. 160 (1995), where we construed a local county code provision that barred accidental retirement benefits when the claimant suffered from a pre-existing medical condition. We explained that under a two-tiered disability retirement structure, a statute

14

"granting ordinary disability retirement benefits [is] a broad remedial pension statute[,] . . . [requiring] only a minimal showing of permanent incapacitation for further performance of duty," whereas, "accidental disability retirement benefits can be recovered only with proof that a disability was the 'natural and proximate result of an accident.' This standard is more stringent than that required for ordinary disability benefits, and, as a result, it is more difficult to qualify for accidental disability retirement benefits." *Id.* at 167. We need not opine here on whether the State version of this law is meant to be more stringent—the analogy that matters lies in the distinction between ordinary disability retirement, for which Ms. Burr indisputably qualified, and disability retirements caused by accidents.

Ms. Burr also pointed us to a number of out-of-state cases, but none of them ultimately helps her either. *Cabe v. Union Carbide Corp.*, 644 S.W.2d 397 (Tenn. 1983), for example, tracks *Harris* in holding that a heart attack suffered by an employee after an argument with a co-worker fell, like the back injury in *Harris*, within the "the outer limits of recovery for injuries brought on by the job environment," particularly given the court's "duty to liberally construe the worker's compensation statutes." *Id.* at 398. The court noted the painful irony that the argument came about because the victim, as a supervisor, was arguing with the other employee in an effort to enforce safety rules. *Id.* at 399. But like *Harris*, the analytical context was structurally different—the court in *Cabe* was charged with determining whether the injury occurred in the normal course of employ-

15

ment. By finding Mr. Cabe's heart attack was compensable as an employment-related injury, the case broadens the concept of foreseeability rather than narrowing it.

The only out-of-state accidental disability retirement case Ms. Burr cites is also distinguishable. In *Patterson v. Board of Trustees, State Police Retirement System*, 942 A.2d 782 (N.J. 2008), the New Jersey Supreme Court defined a "permanently disabling mental injury" for purposes of the police accidental retirement benefit in much the same way we have defined an "accident" here:

> a permanently disabling mental injury, that is the direct result of a mental stressor that is identifiable as to time and place, *undesigned and unexpected*, *external to the member* (not the result of pre-existing disease that is aggravated or accelerated by the work), that *occurred during and as a result of the member's duties*, and was not the result of the member's willful negligence, can qualify the member for an accidental disability retirement benefit.

*Id.* at 794 (emphasis added). The holding in *Patterson* really only recognized the *possibility* that a police officer could recover if he could demonstrate the existence of a "traumatic event" that the Court clarified would have to result from PTSD, based upon statutes within the State *Police* Retirement System. *Id.* at 791-92. The key difference, which we decline to import into this very different context without direction from the General Assembly, was that *Patterson* contemplated the possibility of a disabling psychological injury that resulted from "terrifying or horror-inducing event[s]," *id.* at 795, occurring in the course of police work, a possibility conceivably foreseeable to them but not foreseeable to non-public safety State employees and that still requires a tangible event very

16

different from a standard supervisor-employee interaction. We find a closer analogy in a New York statute that observes a two-tiered retirement disability benefits system and in cases that hold, as we do here, that disagreements in the workplace cannot qualify as accidental or traumatic events. *See, e.g.*, *Kesch v. Hevesi*, 813 N.Y.S.2d 275, 276-77 (N.Y. App. Div. 2006) (holding that no "accident" took place when the claimant's employer told him he was to be suspended and demoted, as it was not a "sudden, fortuitous mischance," but merely an "inherent and anticipated part of employment"); *Baird v. Kelly*, 806 N.Y.S.2d 578, 580-81 (N.Y. App. Div. 2006) (similarly holding that harassment by co-workers was purposeful and not an accident).

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**