*Md. State Highway Administration v. Brawner,* No. 1643, September Term 2019, Argument Date: 11/6/20

## Procurement Law

A subcontractor is entitled to make a contract claim against a procurement agency only if there is a direct contract between the claimant and that agency.  The subcontractor had a contract with a contractor to provide materials on a state highway project. Although the state agency had approved the materials the subcontractor would use in state highway noise barrier wall, that did not suffice to create a contract between the subcontractor and the agency. As such, the subcontractor did not have standing to present a claim against the agency. The mere approval of a company's product as being acceptable for a project does not make that company a procurement contractor with standing to make a claim.

## Timeliness

In construction contracts, a contractor must file written notice of a claim against a procurement agency within 30 days after the basis for the claim is known or should have been known and the support for the claim itself must be filed within 90 days after submission of the notice of the claim. The subcontractor alleged the contractor was obligated to pass through its complaints to the procurement agency. The court affirmed the decisions of the Maryland State Board of Contract Appeals to dismiss the claim as untimely because the contractor failed to file a written pass-through notice with the 30 days.

Circuit Court for Baltimore City
Case No. 24-C-19003208

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1643

September Term, 2019

MARYLAND STATE
HIGHWAY ADMINISTRATION

v.

BRAWNER BUIILDERS, INC.

Beachley,
Gould,
Wilner, Alan M.
    (Senior Judge, Specially Assigned),

JJ.

Opinion by Wilner, J.

Filed: December 18, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case arises under the State procurement law. The State Highway Administration (SHA) rejected claims filed by appellees Brawner Builders, Inc. (Brawner) and Faddis Concrete Products, Inc. (Faddis) on the grounds that (1) Faddis had no procurement contract with SHA and therefore had no standing to file a procurement claim, and (2) the claims filed by Brawner and Faddis were untimely. In an appeal by appellees, the Maryland State Board of Contract Appeals (MSBCA) agreed with SHA on both of those issues and entered a Summary Decision affirming SHA's rejection of the claims.

In a judicial review action, however, the Circuit Court for Baltimore City had a different view. It concluded, (1) as a matter of law, that Faddis did have a procurement contract with SHA and was entitled to file a claim, and (2) that there was a genuine dispute of material fact as to whether the claims were timely. It therefore vacated the MSBCA summary decision and remanded the case for a hearing on the merits of the claims. Before us is SHA's appeal from that judgment. We shall reverse the Circuit Court judgment and remand with instructions to affirm the MSBCA order.

BACKGROUND

The project that spawned this dispute was the construction of a 0.38-mile noise barrier wall along a stretch of I-95 in Howard County. Noise abatement measures along State highways are required both for Federal funding of highway construction projects and by State law. As a result, in August 2011, SHA issued a Highway Noise Policy that

set forth substantive requirements for precast concrete products and a procedure for SHA certification of plants producing those products. Pre-approval of a plant by SHA was required in order for a manufacturer to be eligible to bid on SHA highway projects. Certification was good for one year, subject to renewal following an annual inspection of the plant and subject also to the manufacturer continuing to operate the plant in conformance with the SHA specifications through a Quality Control Plan. SHA charged a cost reimbursement fee for the cost of inspection and certification. Pursuant to that process, SHA, at some point, certified Faddis's plant in Downingtown, Pennsylvania as "Qualified for Sourcing on State Projects" and included that plant on its list of pre-approved manufacturers of noise barrier systems.

The prime contract for the construction of the 0.38-mile section (Contract No. H02485126) was entered into with Brawner on November 19, 2012. That contract, for whatever reason, was not placed in evidence in the court proceeding and therefore is not included in the record. In February 2013, Brawner and Faddis entered into a subcontract, evidenced by a purchase order, for Faddis to furnish 40,910 noise wall panels and three access doors. All materials and work were required to be in conformance with the conditions and specifications pertaining to the prime contract. The purchase order was contingent on SHA approval of Faddis as a supplier and made clear that Brawner was obligated to pay for all products ordered, produced, and shipped regardless of any payment to Brawner by SHA. There were to be no set-offs. Brawner reserved the right

to cancel the subcontract if Faddis was in breach of any of its obligations, including the performance or delivery of non-conforming work or materials.

In September 2013, Faddis furnished SHA with a sample panel which, on September 27, SHA approved for use on the project. Based on that approval, Faddis began manufacturing the panels for Brawner to erect pursuant to its (Brawner's) contract with SHA.

SHA employed an outside agency to furnish inspectors to assure compliance with the SHA standards, one of whom was Nick Patras. Mr. Patras was stationed at Faddis's Downingtown plant for the purpose of inspecting panels destined for the SHA project. No panels were to be shipped without his approval. It appears, at least from SHA's perspective, that Mr. Patras was not doing his job properly, and he eventually was dismissed. In March 2014, SHA's Office of Materials and Technology concluded that panels manufactured by Faddis after November 27, 2013 contained aggregate from an unapproved source, which was a violation of the noise barrier standards, and, as a result, the required strength of the panels could not be determined. Investigations led the Assistant Division Chief for Field Operations (Christopher Gale) to conclude, among other things, that, throughout the production of the panels, Faddis had (1) failed to provide adequate documentation of the source material for the exposed aggregate panels, (2) altered cylinder test data to reflect values higher than what the material actually achieved, (3) used a mix design that did not meet SHA specifications, and (4) was extremely uncooperative about making changes to meet specifications.

3

On May 2, 2014, SHA's District Engineer, David Coyne, informed Brawner of those conclusions and requested a response as to how Brawner intended to remedy the problem. Faddis was not copied on that letter. Brawner's project manager responded six days later, on May 8, that the problem was not Brawner's to remedy, that it involved instead "a breakdown in the fabrication, inspection, and acceptance procedure at an SHA pre-approved concrete precast facility." The letter requested a temporary partial shutdown of the project and advised that Brawner was reserving its rights to extended contract performance, including monetary compensation. Brawner added that "we are not requesting either at this time but reserve our right to do so should it become necessary."

On May 9, in a letter to Kevin Iddings, Faddis's Operations Manager, Mr. Gale set forth in detail the concerns of SHA, which included failure to provide adequate documentation regarding the exposed aggregate material used in the panels, mixing concrete "of inconsistent and questionable quality," failure to comply with Faddis's own Quality Control Plan, and using a coarse aggregate from an unapproved source that was not in conformance with Maryland Department of Transportation standards. The letter gave notice that further purchases were suspended for 180 days during which Faddis would be required to take certain specified remedial action. On May 21, Mr. Iddings responded to the points made by Mr. Gale, asserting that, although Faddis "disagree[d] with many of the representations made in the SHA letter," it remained committed to resolving the outstanding issues to SHA satisfaction.

4

Exacerbating the situation, on June 9, 2014, SHA's Chief of Concrete Technology Division, Michelle Armiger, sent e-mails to officials at the Virginia and Pennsylvania Departments of Transportation advising them of the problems SHA had been having with Faddis and asking whether they had experienced similar issues. Ten days later, the Director of SHA's Office of Materials Technology sent an e-mail to those agencies clarifying that the issues mentioned by Ms. Armiger were in dispute, that there was an administrative process in which SHA and Faddis were engaged, and there had been no final determination by SHA.

The next event in this drama consisted of three letters from Faddis on June 23, 2014. One was to SHA's District Engineer, David Coyne, which stated that it supplemented "notices of claims previously submitted by Brawner," and advised that SHA's action had "impacted Faddis as it specifically relates to the contract *between Faddis and Brawner"* (emphasis added) and had resulted in losses for which "Faddis reserves the right to recover damages for all costs including those related to the idling of Faddis's plant and equipment and interferences with other contracts and Pennsylvania's and Virginia's Departments of Transportation." Faddis insisted that SHA "take immediate steps to abate the harm to Faddis and address these claims and impacts due to its directions and actions."

The second letter was to Brawner, asking that it provide Faddis with "the notice of claim letter" sent to SHA related to the contract between SHA and Brawner and that it furnish SHA with a copy of "this letter which serves to supplement the prior notice and

5

advise the SHA" of continuing damages. The letter did not identify the alleged notice of claim letter to which it referred. The third letter was from Faddis's attorney, Paul Logan, to Scott Morrell, the Assistant Attorney General who represented SHA. In that letter, Mr. Logan took issue with the conclusions reached by SHA as specified in Mr. Coyne's May 2 letter to Brawner, contended that SHA had acted precipitously and without legal or factual justification, and insisted that (1) all suspensions be lifted, (2) Faddis's panels be accepted, and (3) the project be deemed complete with no liquidated damages or penalties.

Mr. Morrell responded the next day through an e-mail advising Mr. Logan that any procurement claim against SHA had to be filed with the SHA procurement officer by Brawner – the prime contractor with which SHA had a contractual relationship – and that any tort claim had to be filed in accordance with the Maryland Tort Claims Act.

The next event occurred on July 16, 2015, when Faddis filed a civil action against Brawner in the U.S. District Court for the Eastern District of Pennsylvania. That action later was transferred to the U.S. District Court for the District of Maryland. The Complaint was based on Brawner's failure to "pass through" Faddis's claim to SHA, thereby precluding Faddis's claim from being considered by SHA. In that regard, the Complaint alleged that, at all relevant times, "Faddis had a direct contract with Brawner, but no direct contract with SHA" that, in accordance with COMAR regulations, "where claims are being pursued on behalf of suppliers and subcontractors, the claim must be initiated by the prime contractor" and that "Brawner was obligated to pass through all of

6

Faddis's claims against the SHA and not impede the rights of Faddis to recover the damages it sustained." Although Faddis alleged that it was entitled to damages due to SHA's wrongful interference with Faddis's status as an approved and prequalified supplier, the action was solely against Brawner; SHA was not a party to the action.

On August 11, 2015, counsel for Brawner sent a copy of the Federal Complaint to SHA's District Engineer who, on August 21, acknowledged receipt and accepted it as a Notice of Claim by Brawner. The Federal case was settled and dismissed on December 7, 2017. The record before us does not reveal the terms of the settlement. No action was taken by SHA on the claim. On May 31, 2018, counsel for Faddis, on behalf of both Faddis and Brawner, requested that SHA issue a written decision on the pending claims. When SHA declined to do so, Faddis and Brawner filed an appeal with MSBCA on September 6, 2018.[1]

Through a Motion for Summary Disposition, SHA argued that:

(1) Except for "contract claims" permitted under the State Finance and Procurement Article (SFP) and implementing regulations in COMAR, SHA enjoys the State's sovereign immunity;

---

[1] As SHA explains in its brief (p. 8, notes 1 and 2), where a claim satisfying the Code and COMAR requirements for a procurement claim is filed, the procurement agency is required to issue a written decision within 180 days after receipt of the claim. If it fails to do so, the failure may be "deemed" a denial that may be appealed to MSBCA. *See* SFP § 15-219(g)(2). At issue in such an appeal, if raised, is whether the claim was a cognizable one that was timely filed.

(2) Only a person having a contract with a procurement agency may file a contract claim, and Faddis, as a mere subcontractor with Brawner, does not have that status;

(3) Even if it did have that status, having settled its Federal suit against Brawner, Faddis has received a recovery for any contract damages due to SHA's conduct, and any damages sought as a result of having contacted the Pennsylvania and Virginia departments would not be in the nature of a contract claim; and

(4) Brawner was a procurement contractor that could have filed a claim on behalf of Faddis but failed to do so timely.

Faddis and Brawner acknowledged that only a procurement contractor may file a procurement claim, but, inconsistently with Faddis's position in the Federal action, they claimed that Faddis *was* a procurement contractor entitled to file a claim directly and that it did so. They based that argument on Faddis's pre-certification by SHA and the agency's approval of Faddis's panels for use in SHA construction projects, which meant that it was, in effect, agreeing to purchase those panels. They asserted that Brawner had given notice of Faddis's claim in the May 8, 2014 letter and that the forwarding of the Complaint in the Federal action on August 11, 2015 constituted the claim itself.

MSBCA rejected that argument. It noted that, under COMAR 21.10.05.06D(2), it was authorized to grant a proposed summary decision – the administrative equivalent of a summary judgment entered by a court – if it finds, after resolving all inferences in favor of the party against whom the motion is made, that there is no genuine issue of material fact and that the moving party is entitled to prevail as a matter of law.

8

As noted, the Board cited two grounds for its decision: first, that, as a subcontractor, Faddis had no standing to make a direct claim against SHA; and second, that Brawner's pass-through claim on Faddis's behalf was untimely. With respect to the first issue, citing its earlier decision in *Appeal of Jorge Company, Inc.* MSBCA No. 1339 (1982), it concluded:

> "Faddis does not have a written 'procurement contract' with Respondent. Accordingly, Faddis does not have standing to file a contract claim directly with Respondent. Any contract claim Faddis had concerning the Project had to be filed as a pass-through claim by Brawner on behalf of Faddis."

With respect to timeliness, the Board found that Faddis had actual knowledge of a claim at least by June 23, 2014, as evidenced by its letter to Brawner on that date, in which it expressly asked Brawner to forward the letter to SHA to supplement what it believed was a prior notice filed by Brawner. As noted, at the time, Faddis accepted the premise that any claim by it had to be passed through by Brawner. That required that notice to SHA of such a claim be presented by July 24, 2014 (30 days later). The Board rejected Faddis's argument that Brawner's letter of May 8, 2014, in response to SHA's letter of May 2, could constitute the actual filing of a claim, noting that the letter merely reserved Brawner's right to file a claim some time in the future. The Board found that the pass-through claim on behalf of Faddis was not filed until August 11, 2015, long past the deadline.

In the judicial review action, the Circuit Court correctly identified the principal issue as being whether Faddis had a procurement contract with SHA. The court regarded

9

that as an issue of law subject to *de novo* review. It turned to the definitions of

"procurement" and "procurement contract" in SFP §§ 11-101(n) and (o).[2] In relevant

part, "procurement" means the process of buying or otherwise obtaining supplies,

services, construction, construction related services and includes "the solicitation and

award of procurement contracts and all phases of procurement contract administration."

With exceptions not relevant here, "procurement contract" means "an agreement in any

form entered into by a State Executive Branch agency authorized by law to enter into a

procurement contract] for procurement."

The court construed the relationship between Faddis and SHA as falling within the

ambit of those definitions. It arrived at that conclusion not just on Faddis's supply of

panels for this particular project but on the premise that it had been approved as "a

qualified source of its product for a multitude of purposes, not just the project that is

before the board in this dispute." That, the court said, constitutes "an independent

procurement contract" founded on its "entitle[ment] to be possibly selected for use in a

contract with the State through another contractor." On that premise, the court held that

the Board erred as a matter of law in its determination that Faddis was not a procurement

contractor entitled to file a claim directly with SHA.

---

[2] At the time of those events, those definitions were codified as subsections (m) and (n) of § 11-101. Effective October 1, 2019, they were re-codified respectively and without textual change as subsections (n) and (o) due to a new definition in subsection (e) that required the relettering of subsequent definitions. We shall use the current designations.

Turning then to the issue of timeliness, the court concluded that the Board inappropriately weighed evidence on whether there was timely notice of Faddis's claim. In reaching that conclusion, the court relied on *Engineering Mgt. v. State Highway*, 375 Md. 211 (2003) for the proposition that "there should be a full hearing on the merits, where the issue of untimely notice is a defense." On those twin grounds, the court "reversed and vacated" the MSBCA summary decision and remanded the case for a hearing on the merits.

## DISCUSSION

### Standard of Review

The standard of review by an appellate court of the decision of an administrative agency, such as MSBCA, was succinctly stated in *Comptroller v. Science Applications*, 405 Md. 185, 193 (2008), and confirmed more recently in *Motor Vehicle Admin. v. Pollard*, 466 Md. 531, 537 (2019) and *Burr v. Retirement & Pension System*, 217 Md. App. 196, 203 (2014). We review the agency's decision directly, not the decision of the Circuit Court. We will affirm the agency decision if it is supported by substantial evidence appearing in the record and is not erroneous as a matter of law, and, because agency decisions are presumed *prima facie* correct, we review the evidence in a light most favorable to the agency. Although no deference is required to be given to the agency's conclusions of law, courts normally give some deference to an agency's interpretations of the laws it is authorized to administer. *Nat'l Waste Mgr's v. Forks of*

11

*the Patuxent*, 453 Md. 423, 441 (2017); *Kim v. Board of Physicians*, 423 Md. 523, 535 (2011); *LVNV Funding v. Finch*, 463 Md. 586, 606, n.10 (2019).

If the agency decision under review was in the form of a summary disposition, we must determine whether that disposition was legally correct, *i.e.*, whether there is no genuine dispute of material fact and the moving party was entitled to that disposition as a matter of law. *Burr, supra*, 217 Md. App. at 203.

## Faddis's Status As A Procurement Contractor

There is a sharp disagreement between the parties regarding Faddis's status as a procurement contractor. SHA's position is that, to be entitled to make a contract claim against a procurement agency, the claim must arise from a direct contract between the claimant and a procurement agency and that Faddis had no such contract.

Until late in the game, Faddis accepted that proposition. Its Federal lawsuit against Brawner was based entirely on that proposition. As noted, Faddis alleged in its Complaint that the COMAR regulations require that "in instances where claims are being pursued on behalf of suppliers and subcontractors, the claim must be initiated by the prime contractor" and that Brawner's refusal to make such a claim on Faddis's behalf precluded Faddis from recovering its losses. At least inferentially, if not directly, that is a concession that it had no standing to present its claim directly to SHA or MSBCA. Faddis has clearly abandoned that position. Its current claim is that, by virtue of SHA's pre-

12

approval and certification of its product, it was a direct procurement contractor and had the right as such to make a contract claim directly on its own behalf. That takes us, ultimately to statutory definitions.

As a preface, SHA points out that, until 1976, the State possessed full common law sovereign immunity from contract actions against the State. *See Katz v. Washington Sub. San. Comm'n*, 284 Md. 503, 507 (1979) ("[T]he doctrine of sovereign immunity from suit, rooted in the ancient common law, is firmly embedded in the law of Maryland" and "is applicable not only to the State itself, but also to its agencies and instrumentalities, unless the General Assembly has waived the immunity either directly or by necessary implication.")

That immunity was partially, and somewhat indirectly, waived by statute in 1976. As now codified in Md. Code, § 12-201(a) of the State Gov't. Article, unless otherwise expressly provided by State law, it precludes the State and its officers and units from raising the defense of sovereign immunity "in a contract action, in a court of the State, based on a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee." *See* also Md. Code, §5-522 of the Courts and Judicial Proceedings Article.[3] Waivers of immunity, which are in derogation of common law, are strictly

_____

[3] It is interesting to note that the waiver of sovereign immunity from tort actions is direct. Section 12-104 of the State Government Article provides that, with certain exceptions, "the immunity of the State and of its units is waived as to a tort action, in a court of the State." That is a direct waiver by the General Assembly. As we observed, § 12-201 uses different language. It prohibits the State and its units from "rais[ing] the defense of

construed in favor of the State.  *Central Collection v. DLD*, 112 Md. App. 502, 513

(1996); *Dept. of Public Safety v. ARA*, 107 Md. App. 445, 457, *aff'd. ARA Health v. Dept.

of Public Safety*, 344 Md. 85 (1996).

It is necessarily implicit from applying a narrow construction to the waiver of

immunity that the Legislature may impose conditions and limitations, both substantive

and procedural, on such a waiver, and it has done so with respect to the waiver of

immunity in both tort and contract actions.  In particular, it has enacted a comprehensive

set of laws governing the selection of procurement contractors, what may or may not be

included in procurement contracts, the monitoring and enforcement of such contracts, and

the processing of contract claims, spread among eight titles of SFP.  This case implicates

several of those statutes, principally those in SFP Titles 11 and 15 dealing with the

structure and procedure for the resolution of procurement disputes.

Both the structure and the procedure hinge on the definition of three terms that

shape the universe we are dealing with – procurement, procurement contract, and contract

claim.  SFP § 11-101(n) defines "procurement" as including the process of "buying or

otherwise obtaining supplies, services, construction [and] construction related services"

as well as "the solicitation and award of procurement contracts and all phases of

---

sovereign immunity in a contract action, in a court of the State."  It is a distinction
without a difference, however. In *ARA Health v. Dept. of Public Safety,* 344 Md. 85, 92
(1996), the Court held that the Legislature may "waive[ ] immunity either directly or by
necessary implication, in a manner that would render the defense of immunity
unavailable," and treated § 12-201 as a waiver.  *See also Katz v. Washington Sub. San.
Comm'n, supra*, 284 Md. at 507, n.2.

procurement contract administration." With exceptions not relevant here, SFP § 11-101(o) defines "procurement contract" to mean "an agreement in any form entered into by a unit for procurement." Those two definitions obviously need to be read together. The third critical term is "contract claim," which is defined in SFP § 15-215 (a) as "a claim that relates to a procurement contract" and includes "a claim about the performance, breach, modification, or termination of the procurement contract."

The structure and procedure begin with the procurement officer, who is the individual authorized by the agency (unit) to enter into, administer, and make determinations and findings with respect to a "procurement contract." SFP § 11-101(o).

With respect to construction projects, this is a two-step process. First, the contractor must file a written *notice* of a claim with the procurement officer within 30 days after the basis for the claim is known or should have been known. SFP § 15-219(a). Within 90 days after submitting that notice, the contractor must submit "a written explanation that states the amount of the contract claim, the facts on which the contract claim is based, and all relevant data and correspondence that may substantiate the contract claim." SFP § 15-219 (b). *See* also COMAR 21.10.04.02. The agency then has a fixed time, depending on the amount of the claim, to investigate and render a decision on the claim. SFP § 1-219 (d)(2). With an exception not relevant here, a contractor may appeal an unfavorable decision to MSBCA within 30 days after receipt of the decision or a deemed denial. SFP § 15-220.

15

Both parties appear to agree that only a "contractor" – a person who has been awarded a procurement contract – may submit a contract claim and that Brawner qualifies as such a person. They also appear to agree, and, as we shall note *infra*, MSBCA has implicitly recognized as well, that a prime contractor may file, as a pass-through, a claim by a subcontractor, although we are unable to find any statute or COMAR regulation that even mentions, must less approves, such a procedure and none has been called to our attention by the parties.

As we have observed, however, Faddis no longer relies on such a procedure but insists that it was a procurement contractor in its own right. Its position arises from SHA's certification of the Downingtown plant and its acceptance of the sample panel supplied by Faddis in September 2013. Those events, it maintains, constitute "an agreement in any form entered into by a unit for procurement," which thus constituted a "procurement contract" that was entered into by a procurement agency for the acquisition of construction or construction-related services. The Circuit Court stressed that those events made Faddis a contractor not just for this particular SHA project but for *all* SHA noise control projects.

SHA, of course, takes a very different view, insisting that "procurement contract" means a contract entered into directly between the procurement unit and the contractor for a particular project or set of projects. Mere approval of a company's product as being acceptable for some future project or even a project for which the unit has already selected and contracted with another contractor does not make that company a

16

procurement contractor with standing to make a claim. In the proceeding before the MSBCA, Faddis admitted that its compensation for supplying the panels would come from Brawner, not SHA. Its purchase order subcontract confirms that point. By interlineation, it precludes "set-offs" and specifies that "Buyer [Brawner] shall pay seller [Faddis] for all products ordered, produced & shipped regardless of payment to buyer by owner [SHA]."

Neither side cites a case that controls this issue, and we have found none. There are, however, two prior decisions of MSBCA that are relevant and that were relied on by MSBCA in this case. *Appeal of Jorge Company, Inc.* involved a sub-subcontractor whose claim was rejected by the Mass Transit Administration and who appealed to MSBCA. The Board dismissed the appeal for lack of jurisdiction, holding that, as the statute defined a contractor as "any person having a contract with a State agency" and as Jorge did not have such a contract, it was not entitled to appeal to the Board. The Board observed that, ordinarily, it could dismiss the appeal "without prejudice to the right of the subcontractor to refile its appeal in the name of the prime contractor," but declined to do so because the claim also was untimely.

That is the case in which MSBCA, at least implicitly, recognized the pass-through procedure for presenting claims of subcontractors. The rulings in *Jorge* were confirmed by MSBCA in *Appeal of Davidsonville Diversified Services*, MSBCA 1339 (1988). There, too, a subcontractor was on a SHA project. When its subcontract was terminated by the prime contractor, it filed an appeal to MSBCA based on SHA's approval of the

17

termination, without ever filing a claim with SHA. It argued that, by reason of the extensive day-to-day control over its work by SHA's field engineer, an implied contract had been created between it and SHA. Citing *Jorge*, the Board reaffirmed the conclusion that a subcontractor that does not have a contract with a State agency cannot maintain the appeal in its own name. It concluded as well that it had no jurisdiction over implied contracts, but only written ones with a procurement agency. Citing yet another of its decisions, in *Boland Trane Associates, Inc.*, MSBCA 1084 (1985), it stated:

> "Since the Legislature sets the terms under which it waives sovereign immunity, it may prescribe what type of contracts with the State may properly be within the ambit of this Board's jurisdiction and what contracts are to be excluded."

Pre-approval of *eligibility* to provide materials, work, or services does not, in our view, constitute a contract to do so. The State procurement law and regulations provide for the pre-approval or certification of various classes of would-be contractors or their products.[4] Pre-approval of an entity's status or products – of eligibility to act as a supplier or even a preferred supplier – does not make the entity a procurement contractor if it is not, in fact, selected by a procurement agency, through a written contract, to provide materials, work, or services to the agency. Many of those entities may end up as

---

[4] *See*, for example, (1) SFP Title 14, Subtitle 2 and COMAR 21.11.01 providing for the certification of small businesses eligible for preference under the Small Business Preference Program; (2) SFP Title 14, Subtitle 3 and COMAR 21.11.03. providing for the certification of minority businesses eligible for participation in Minority Business Enterprise Program; (3) SFP 14-415, providing a preference for certified recyclers.

subcontractors or sub-subcontractors that have no direct contract with the procurement agency.

We note as well COMAR 21.10.04.02D, dealing with contract claims and disputes, that requires each procurement contract to provide notice of the time requirements for filing claims, acceptable methods of filing a claim, and limitations on filing claims electronically, none of which were part of the pre-approval or certification of Faddis's Downingtown plant or acceptance of the test panel.

From a fair and reasonable construction of the statutes and COMAR regulations, we believe that MSBCA was correct in its conclusion, as a matter of law, that Faddis had no procurement contract with SHA and, as a result, was not a procurement contractor entitled to file an independent claim with SHA or to appeal to MSBCA. Faddis's own assertion of that proposition in its Federal complaint against Brawner powerfully supports that conclusion, although we do not rely on it because we do not need to do so.

**Timeliness**

That leaves the question of whether a timely claim was made on Faddis's behalf by Brawner. We start with the requirement in SFP § 15-219 (a) that, with respect to construction contracts, a contractor must file written notice of a claim within 30 days after the basis for the claim is known or should have been known and the requirement in § 15-219 (b) that support for the claim itself must be filed within 90 days after submission of the notice of the claim.

19

As noted, the court believed that there was disputed evidence on that issue that required a full evidentiary hearing. SHA acknowledged Brawner's forwarding of Faddis's Federal Complaint on August 11, 2015 as a Notice of Claim "regarding the matter of *Faddis Concrete, Inc. v. Brawner Builders, Inc.*" The question is whether there was evidence of any earlier notice of claim by Brawner on behalf of Faddis. Correspondence between Faddis and SHA that was not part of any submission by Brawner doesn't count.

Three documents are dispositive. The first is Faddis's June 23, 2014 letter to Brawner reciting, at least in general terms, Faddis's damages from the actions of SHA and requesting that Brawner forward that letter to SHA and advise SHA of the damages suffered by Faddis. That shows the latest date when Faddis and Brawner both were aware that Faddis had a claim that needed to be presented on its behalf by Brawner.

The second document is Brawner's May 8, 2014 letter to SHA, responding to Mr. Coyne's May 2 letter informing Brawner of SHA's conclusions regarding the unacceptability of Faddis's panels. In that May 8 letter, Brawner essentially said that "it's not our problem." The letter acknowledged SHA's position, advised that Brawner and Faddis both had been harmed by SHA's conduct, and asserted that "we reserve our rights" to extended contract duration and monetary compensation "but are not requesting either at this time but reserve our right to do so should it become necessary." Though recognizing that, in considering a summary disposition, the Board needed to resolve all inferences in favor of Brawner and Faddis, the Board nonetheless concluded that

20

"nothing in [that] language could be construed to be a proper notice of Faddis' claim by Brawner to [SHA]." We agree. It is a direct negation of any attempt to make a claim at that point.

The third document is Faddis's Federal Court complaint, filed July 16, 2015, which fully supports that conclusion by the Board. In that Complaint, Faddis alleged that Brawner was obligated to pass through all of Faddis's claims against SHA and not impede Faddis's right of recovery (¶ 33), that Faddis had provided multiple timely and proper notices to Brawner with requests that they be presented to SHA (¶¶ 37, 38), and that "for reasons still undisclosed to Faddis, upon information and belief, Brawner refused to act, as of the date of this Complaint, continues to refuse to facilitate the pursuit of any claims by or on behalf of Faddis against SHA." (¶ 43). There can be no clearer admission that, as of that date, no written pass-through notice of claim had been filed by Brawner on behalf of Faddis.

It is evident, then, that Brawner failed to file the notice of claim within 30 days after the basis for Faddis's claim was known to Brawner, in violation of SFP 15-219 (a) and COMAR 21.10.04.02B. The COMAR regulation states explicitly that "[a] notice of claim, that is not filed within the time prescribed in Regulation .02 of this chapter *shall be dismissed*." (Emphasis added). There is no exception to that statement and no ambiguity as to its meaning. Following its earlier decision in *Appeal of David A. Bramble, Inc.*, MSBCA 2823 (2013), the Board held that provision mandatory. That is a reasonable construction of the COMAR regulation.

21

We therefore conclude that there was no flaw in the Board's findings of fact or conclusions of law or in the entry of a summary decision. The relevant documents speak for themselves. We acknowledge the problem that subcontractors may face when they have a legitimate claim and the prime contractor, whether negligently or deliberately, fails or refuses to file a timely claim on the subcontractor's behalf. On the other hand, as SHA acknowledged in oral argument, there may be circumstances where the prime contractor could have a conflict of interest in filing a pass-through claim. There may be ways to deal with that problem without allowing persons having no direct contractual relationship with a procurement agency to file claims against that agency, but any solution must come from the Executive or the Legislative Branch.

**JUDGMENT REVERSED; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF JUDGMENT AFFIRMING DECISION OF MARYLAND STATE BOARD OF CONTRACT APPEALS; APPELLEE TO PAY THE COSTS.**

22