*Brawner Builders, Inc., et al. v. Maryland State Highway Administration*, No. 58, September Term, 2020, Opinion by Booth, J.

**STATE FINANCE AND PROCUREMENT—PROCUREMENT CONTRACTS—FORMATION**

The Court of Appeals held that certifying a supplier as a pre-approved source of materials for future projects did not constitute a procurement contract, as that term is defined in the State Finance and Procurement Article ("SF") § 11-101. SF § 11-101(n) defines procurement as the process of buying or otherwise obtaining goods or services. Relying on this definition, the Court of Appeals reasoned that certifying a supplier as a pre-approved supplier of materials for future projects, without more, is not a procurement contract because the State is neither buying nor obtaining goods or services from the certified supplier.

**STATE FINANCE AND PROCUREMENT—PROCUREMENT CONTRACTS—DISPUTE RESOLUTION—NOTICE OF CLAIM—TIMELINESS**

SF § 15-219 provides that a contractor must file written notice of a claim against a procurement agency within 30 days after the basis for the claim is known or should have been known, and the support for the claim itself must be filed within 90 days after submission of the notice of claim. The Court of Appeals held that the Maryland State Board of Contract Appeals did not err in concluding a subcontractor failed to timely file a procurement contract claim even though such determination was made at the summary disposition stage because the undisputed facts showed notice of claim was not filed by the contractor within 30 days after the basis for the claim was known or should have been known.

Circuit Court for Baltimore City
Case No.: 24-C-19-003208
Argued: June 4, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 58

September Term, 2020

BRAWNER BUILDERS, INC., et al.

v.

MARYLAND STATE HIGHWAY
ADMINISTRATION

Barbera, C.J.
McDonald
Booth
Biran
Rodowsky, Lawrence F.
     (Senior Judge, Specially Assigned)
Harrell, Jr. Glenn T.
     (Senior Judge, Specially Assigned)
Raker, Irma S.
     (Senior Judge, Specially Assigned),

JJ.

Opinion by Booth, J.

Filed: August 25, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In this case, we must determine whether a material supplier's status as a "pre-approved supplier" of concrete panels on construction projects administered by the Maryland State Highway Administration ("SHA") constituted a "procurement contract" with the State under the State Finance and Procurement Article. The supplier, who was a subcontractor on a State construction project, contends that its status as a pre-approved supplier of products by SHA constituted a procurement contract with the State, thereby entitling the subcontractor to file a direct contract claim against SHA under the procurement statute.

The dispute arises out of a contract between SHA and Brawner Builders, Inc. ("Brawner") entered on November 19, 2012, for the construction of noise barriers along a section of I-95 in Howard County. To secure the necessary materials for the project, Brawner subcontracted with Faddis Concrete Products, Inc. ("Faddis"), a pre-certified noise barrier manufacturer, to obtain noise wall panels for the project. Unfortunately, things did not proceed as planned. Shortly after Faddis began manufacturing noise wall panels for Brawner's use in connection with the project, SHA learned that the noise panels produced by Faddis contained construction aggregate of a non-conforming coarseness from an unapproved source. Following an investigation, SHA suspended approval of Faddis-manufactured noise panels for a minimum of 180 days.

Displeased with SHA's decision, Faddis sent letters to SHA and SHA's legal counsel alleging, in general terms, harm due to SHA's decision to suspend approval of Faddis-produced noise panels. In addition to sending letters to SHA, Faddis also sent a letter to Brawner. This letter, which apparently recognized that the Maryland State Board

of Contract Appeals ("MSBCA") will not hear procurement contract claims filed by subcontractors unless they pass through the prime contractor, requested that Brawner pass Faddis's contract claims through to SHA, which Brawner ultimately declined to do.

Approximately four years later, Faddis and Brawner sent a joint letter to SHA demanding that SHA render decisions on Faddis's claims, which they asserted were properly submitted to SHA. SHA did not respond to this letter. Interpreting SHA's silence as a denial of all claims, the parties filed an appeal with the MSBCA. SHA timely moved for summary disposition, which the MSBCA granted. In so doing, the MSBCA agreed with SHA that Faddis had no procurement contract with SHA and therefore had no standing to file a procurement claim unless such claim timely passed through Brawner. The MSBCA reasoned that, because Brawner did not timely file Faddis's claim, dismissal was appropriate.

Faddis and Brawner timely filed a petition for judicial review in the Circuit Court for Baltimore City. The circuit court reversed the MSBCA's decision, concluding that, as a matter of law, SHA's certification of Faddis as a pre-approved supplier of noise barriers constituted a procurement contract, thereby conferring upon Faddis standing to file a direct claim against SHA. The circuit court also found error in the MSBCA's conclusion that Faddis failed to timely file a notice of claim with SHA. According to the circuit court, it was inappropriate for the MSBCA to make factual determinations with respect to notice without a full hearing on the merits.

An appeal to the Court of Special Appeals followed. In a reported decision, the intermediate appellate court reversed the circuit court's decision. *Md. State Highway*

2

*Admin. v. Brawner Builders, Inc.*, 248 Md. App. 646 (2020). In so holding, the court agreed with the MSBCA's conclusion that Faddis lacked standing to file a direct claim against SHA because SHA's certification of Faddis as a pre-approved supplier of noise barriers, without more, did not constitute a procurement contract. Similarly, the court agreed with the MSBCA's conclusion that Brawner failed to timely file notice of claim on Faddis's behalf.

For the reasons more fully set forth herein, we affirm the decision of the MSBCA. We agree with the MSBCA that SHA's certification of Faddis's manufacturing plan as a pre-approved supplier of concrete panels on SHA construction projects does not fall within the definition of a "procurement contract" under the State Finance and Procurement Article. Consequently, Faddis, as Brawner's subcontractor, did not have standing to bring direct contract claims against SHA. We also determine that, as a matter of law, Brawner's submission of a notice of a claim on Faddis's behalf was not timely.

## I.

### Factual and Procedural Background

#### A. *SHA Highway Noise Policy and Manufacturer Certifications*

When Congress enacted the Federal-Aid Highway Act of 1970, Congress compelled the Federal Highway Administration (the "FHWA") to, among other things, adopt highway noise abatement standards and conditioned approval of federal highway projects on adherence to such standards. *See* Federal-Aid Highway Act of 1970, Pub. L. No. 91-605, § 136 (codified, as amended, at 23 U.S.C. § 109(i)). Consistent with this directive, the FHWA not only promulgated regulations establishing noise abatement standards, *see*

3

Noise Standards and Procedures, 38 Fed. Reg. 15,953 (June 19, 1973) (codified, as amended, at 23 C.F.R. § 772), but also issued guidance requiring state highway agencies to adopt written noise policies demonstrating substantial compliance with the FHWA noise regulations, *see* Fed. Highway Admin., U.S. Dep't of Transp., *Highway Traffic Noise Analysis and Abatement Policy and Guidance* 65 (June 1995). The FHWA later issued additional guidance designed to assist states in drafting adequate noise abatement policies, though this guidance left considerable discretion to the states. One such area of deference left to the states included the authority to draft noise barrier material specifications, subject to FHWA approval. Fed. Highway Admin., U.S. Dep't of Transp., *Highway Traffic Noise: Analysis and Abatement Guidance* 57 (Dec. 2011).

In Maryland, SHA is the agency that implements the FHWA noise regulations. As a result, SHA is tasked with developing noise barrier material specifications and submitting such specifications to FHWA for approval. To ensure that noise barrier manufacturers comply with SHA's specifications, SHA has also developed procedures to pre-certify facilities producing noise barriers for use in SHA projects and limited eligibility to bid on SHA highway projects to SHA-certified manufacturers.

Pursuant to this process, manufacturers interested in attaining SHA pre-certification must, among other things, develop and submit to SHA a Quality Control Plan, undergo an initial plant inspection, and submit to SHA a cost reimbursement fee to cover costs associated with certifying production facilities. Once certified, SHA places the manufacturer on a list of pre-approved noise barrier suppliers. Certification is valid for one year, subject to the condition that the certified manufacturer continues to operate the

4

plant in accordance with SHA specifications. In the event SHA concludes that a manufacturer failed to satisfy SHA specifications, SHA may suspend or revoke a manufacturer's certification.

## B.       The I-95 Construction Project

On November 19, 2012, SHA contracted with Brawner to install noise barriers along a 0.38-mile stretch of I-95 in Howard County.[1] Less than three months later, on February 7, 2013, Brawner subcontracted with Faddis, whose Downington, Pennsylvania plant had been certified by SHA as a pre-approved supplier of noise barrier systems, to secure 40,910 noise wall panels and three access doors for the project. In the months that followed, Faddis produced—and furnished to SHA for inspection—a sample noise wall panel. SHA approved the sample on September 27, 2013, and based on that approval, Faddis began manufacturing additional panels for Brawner's use in connection with the project.

### The Downington Plant Suspension

The project did not proceed as anticipated. Shortly after Faddis began manufacturing noise panels for Brawner *en masse*, SHA learned that on or around November 27, 2013, Faddis began manufacturing noise panels that contained construction aggregate[2] of a non-conforming coarseness from an unapproved source, which was a violation of SHA's noise barrier standards. After SHA issued a Non-Compliance Report

---

[1] For reasons unknown to this Court, this contract was never placed into evidence and, as a result, is not in the record.

[2] Construction aggregates are coarse particulate materials mixed into concrete that may affect the overall strength or durability of a concrete structure. Common construction aggregates include sand, gravel, and crushed stone.

5

related to the incident and Faddis agreed to a Quality Improvement Plan, and after a subsequent investigation, SHA continued to have concerns. Specifically, SHA Assistant Division Chief for Field Operations, Mr. Christopher Gale, concluded, among other things, that Faddis: (1) used a mix design that did not meet SHA specifications "[f]or a considerable portion of production[;]" (2) created panels of inconsistent quality due to deviations from the approved mix design; (3) failed to provide timely documentation identifying the source material for the exposed aggregate panels; (4) "altered cylinder test data to reflect values higher than what the material actually achieved[;]" and (5) "engaged in a pattern of deceptive practices," including the obstruction or delay of almost every SHA effort to assist Faddis in complying with SHA specifications.

Following the investigation, SHA's District Engineer, Mr. David Coyne, sent Brawner a letter, dated May 2, 2014, advising Brawner of Faddis's use of unapproved aggregate, and requesting a response from Brawner explaining "how [Brawner] intends to remediate this situation." Faddis was not copied on the May 2 letter. On May 8, 2014, Brawner's project manager responded to SHA's letter, advising SHA that the problem was not Brawner's to remedy, and asserting that the problem was "a breakdown in the fabrication, inspection, and acceptance procedure at a SHA pre-approved concrete precast facility." Brawner advised SHA that if SHA ultimately revoked Faddis's status as a pre-approved source of noise barriers, SHA should inform Brawner in a separate letter. The May 8 letter from Brawner to SHA requested a temporary shutdown of the project and advised SHA that Brawner was reserving its rights to extend contract performance and seek

6

monetary compensation.  Brawner added that, "*[w]e are not requesting either at this time but reserve our right to do so should it become necessary*."  (Emphasis added).

A day later, on May 9, 2014, Mr. Gale sent a letter to Mr. Kevin Iddings, Faddis's Operations Manager, suspending approval of noise barriers manufactured at the Downington plant for a minimum of 180 days, during which time Faddis would be required to undertake specific remedial action.  The letter detailed several reasons for SHA's decision, including not only Faddis's failure to "provide adequate documentation of the sources for the exposed aggregate material used in the [noise] panels supplied to SHA[,]" and "comply with provisions of [its] own Quality Control Plan," but also Faddis's use of a coarse aggregate that neither received SHA approval nor conformed to SHA standards. SHA advised Faddis that future approval of noise panels following the 180-day suspension would be contingent on, among other things, demonstrating that all mix designs prepared for SHA projects conform to all applicable SHA specifications.  In a letter dated May 21, 2014, Mr. Iddings responded to the issues raised by Mr. Gale, and stated that, although "Faddis disagree[d] with many of the representations made in the SHA letter, [Faddis] remain[ed] committed to resolving outstanding issues to SHA satisfaction[.]"

The relationship between Faddis and SHA deteriorated in June.  On June 9, 2014, the Chief of SHA's Concrete Technology Division, Ms. Michelle Arminger, sent emails to officials at the Virginia Department of Transportation ("VDOT") and the Pennsylvania Department of Transportation ("PDOT"), advising those agencies that SHA was having compliance issues with Faddis, and asking whether they had experienced similar issues. Ten days later, the Director of SHA's Office of Materials Technology sent a follow-up

7

email to VDOT and PDOT, clarifying that the issues mentioned in Ms. Arminger's email were in dispute, that SHA and Faddis were engaged in an administrative dispute process, and that there had been no "final determination by SHA regarding compliance."

A few days later, on June 23, 2014, Faddis sent letters to SHA, Brawner, and SHA's legal counsel. The first letter, addressed to SHA's Mr. Coyne, stated that the letter intended to "supplement[] the notices of claims previously submitted by Brawner[.]"[3] In its letter, Faddis notified SHA that Faddis was reserving its right to recover damages for costs related to SHA's decision to suspend approval of noise panels manufactured at the Downington plant. It was Faddis's position that, although "SHA's direct communications with Faddis . . . [were] not contract specific," SHA's decision to "halt[] operations at Faddis'[s] [Pennsylvania] plant[]" had "impacted Faddis as it specifically relates to the contract between Faddis and Brawner[.]" Faddis further advised SHA that additional damages were incurred as a result of non-compliance notices emailed to VDOT and PDOT.

The second letter, which Faddis addressed to Brawner, requested that Brawner provide Faddis with the "notice of claim letter" sent to SHA related to the contract between SHA and Brawner, and that Brawner provide SHA with a copy of "this letter which serves to supplement the prior notice and advise the SHA" of continuing damages. The letter did not identify the "prior notice" to which the letter referred.

The third letter was from Faddis's attorney, Paul Logan, and was addressed to SHA's legal counsel, Assistant Attorney General Scott Morrell. This letter not only

---

[3] It was—and still is—Faddis's position that Brawner's letter dated May 8, 2014 constituted a notice of claim for both Brawner and Faddis.

provided an overview of the circumstances, as Faddis perceived them, leading up to the present dispute but also accused SHA of acting precipitously, without notice, and without factual or legal justification. To mitigate the harms associated with SHA's conduct, Faddis demanded that SHA lift the 180-day suspension, accept Faddis's noise panels, deem the project complete without assessing any liquidated damages or penalties, and provide a substantive communication to VDOT and PDOT detailing Faddis's good standing and compliance with SHA specifications. The next day, Mr. Morrell responded by email to Mr. Logan, advising him that any procurement claim against SHA had to be filed by Brawner—the prime contractor with which SHA has its contractual relationship—and that any tort claim had to be filed in accordance with the Maryland Tort Claims Act.

*The Federal Lawsuit*

A little over a year later, on July 16, 2015, Faddis filed a complaint against Brawner in the U.S. District Court for the Eastern District of Pennsylvania.[4] In its complaint, Faddis alleged it was harmed by Brawner's failure to "pass through" Faddis's claims against SHA, as such failure effectively precluded Faddis from pursuing its claims against SHA. In making this argument, Faddis took the position that it had no direct contract with SHA, and as a result, Faddis's claims against SHA had to pass through the prime contractor— Brawner—before being considered. SHA was not a party to this lawsuit.

Less than a month after Faddis filed its complaint, on August 11, 2015, Brawner sent SHA a copy of the complaint, together with a letter advising SHA of the pending

---

[4] The case was later transferred to the U.S. District Court for the District of Maryland.

9

lawsuit. Brawner indicated that the letter was intended to serve as a "Notice of Claim[.]" SHA acknowledged receipt on August 21, 2015 and accepted it as a Notice of Claim by Brawner. Thereafter, Brawner and Faddis settled the federal case and it was dismissed on December 7, 2017. The record before us does not reveal the terms of the settlement. SHA did not take any action on the claim. On May 31, 2018, counsel for Faddis, on behalf of both Brawner and Faddis, requested that SHA issue a written decision on the pending claims. When SHA failed to do so, on September 6, 2018, Brawner and Faddis (sometimes referred to collectively as "Petitioners") filed an appeal with the MSBCA.[5]

### C.    The Administrative Proceeding

After the appeal was filed, SHA filed a motion to dismiss, or in the alternative, a motion for summary decision. In its filing, SHA argued that dismissal was appropriate because only persons with whom SHA enjoys a direct contractual relationship may file a contract claim against SHA. SHA reasoned that, because Faddis was simply a subcontractor of Brawner, Faddis lacked standing to sue SHA directly. SHA also argued dismissal was appropriate because (1) Brawner failed to timely file both a notice of claim and a detailed claim within the time periods prescribed by the Code of Maryland Regulations ("COMAR"); and (2) Faddis's claims did not fall within the waiver of the State's sovereign immunity, as Faddis's claims were not "contractual claims arising out of a written procurement contract."

---

[5] Maryland law provides that where an agency fails to timely issue a decision on a pending procurement contract claim, such failure may be treated as a denial of the contractor's claim that may be appealed to the Maryland State Board of Contract Appeals (the "MSBCA"). Md. Code, State Finance and Procurement ("SF") § 15-219(d), (g).

10

Faddis and Brawner agreed with SHA's contention that only procurement contractors may file a procurement claim against SHA. However, contrary to the position that Faddis took in the federal case, Faddis now contended that *Faddis was a procurement contractor.* According to the Petitioners, Faddis's "contractor" status flowed from its having been certified as one of several pre-approved suppliers of concrete panels on SHA projects.

In response to SHA's assertion that Brawner failed to give timely notice of the claim, the Petitioners asserted that Brawner's May 8, 2014 letter to SHA constituted notice of Faddis's pass-through claim and that Faddis's federal complaint, forwarded with Brawner's August 11, 2015 letter to SHA, constituted the claim itself.

On May 17, 2019, the MSBCA issued an opinion and order granting SHA's motion for summary decision. First, the MSBCA ruled that Faddis did not have a written procurement contract with SHA, and therefore, did not have standing to file a direct contract claim. In reaching this conclusion, the MSBCA rejected the argument that Faddis had a written procurement contract with SHA by virtue of its certification as a pre-approved manufacturer of precast concrete walls. Consequently, the MSBCA determined that "[a]ny contract claim Faddis had concerning the [p]roject had to be filed as a pass-through claim by Brawner on behalf of Faddis."

Second, the MSBCA noted the undisputed fact that both Faddis and Brawner had actual knowledge of the claim at least by June 23, 2014, when Faddis wrote to Brawner asking it to "furnish to the SHA a copy of this letter which serves to supplement the prior notice and advise the SHA of the continuing and additional damages related to SHA's

11

'notices' to VDOT and [P]DOT." Accordingly, the MSBCA concluded that Brawner was required to provide notice of the claim within 30 days of that letter, *i.e.*, no later than July 24, 2014. The MSBCA rejected Faddis's argument that Brawner's letter of May 8, 2014, in response to SHA's letter of May 2, could constitute the actual filing of a claim, noting that the letter merely reserved Brawner's right to file a claim in the future. The MSBCA determined that Brawner failed to provide SHA with notice of Faddis's claims until August 11, 2015 and concluded that it was untimely.

### D. The Circuit Court Proceeding

Faddis and Brawner sought judicial review of the MSBCA's decision in the Circuit Court for Baltimore City. After considering written and oral arguments, the circuit court reversed the MSBCA's decision. In so doing, the circuit court disagreed with the MSBCA's conclusion that Faddis was not a procurement contractor. According to the circuit court, SHA's approval of Faddis as a pre-approved noise panel supplier was "an independent procurement contract[]" because Faddis paid SHA "a fee of some sort" to secure a plant inspection that, if successful, would permit Faddis "to be possibly selected for use in a contract with the State through another contractor." The circuit court reasoned that because Faddis was a procurement contractor, Faddis was entitled to file a direct claim against SHA.

With respect to whether Faddis provided SHA with timely notice of its claims, the circuit court determined that the MSBCA "inappropriately weighed evidence on the issue of whether or not there was adequate timely notice of a claim given." On these grounds,

12

the circuit court reversed and vacated the MSBCA's summary decision and remanded the case for a hearing on the merits.

### E. The Court of Special Appeals Proceeding

SHA appealed the circuit court's decision to the Court of Special Appeals. The intermediate appellate court reversed the decision of the circuit court. *Md. State Highway Admin. v. Brawner Builders, Inc.*, 248 Md. App. 646 (2020). The Court of Special Appeals concluded that the certification of Faddis's manufacturing plant as a pre-approved supplier of concrete panels on SHA construction projects did not fall within the definition of a "procurement contract" under the State Finance and Procurement Article. *Id.* at 662–63. The court observed that, without a separate written contract with a procurement agency, a pre-approved supplier does not automatically become a procurement contractor as a result of its eligibility to become one. *Id.* at 662. Consequently, the court concluded that Faddis, as Brawner's subcontractor, did not have standing to bring direct contract claims against SHA. *Id.* at 663.

The Court of Special Appeals also determined that, as a matter of law, Brawner's submission of a notice of claim on Faddis's behalf was not timely, where the undisputed facts established the date when Petitioners knew the basis for Faddis's claim against SHA, but Brawner did not submit its notice of claim until well over a year after the expiration of the 30-day statutory filing period. *Id.* at 664–65.

13

Faddis and Brawner petitioned this Court for a writ of *certiorari*, which we granted, to consider the following issues[6]:

> (1) Did the MSBCA err in concluding that Faddis was not a procurement contractor and therefore lacked standing to file a direct procurement contract claim against SHA?
>
> (2) Did the MSBCA err in concluding that Brawner failed to timely file a pass-through claim on Faddis's behalf?

For the reasons that follow, we answer both questions in the negative and shall affirm the decision of the MSBCA.

## II.

### Standard of Review

When this Court is called upon to review an appeal from an administrative decision, "we 'review the agency's decision directly[.]'" *Motor Vehicle Admin. v. Pollard*, 466 Md.

---

[6] For ease of discussion, we have consolidated and rephrased the issues on appeal. The questions in the original petition for writ of *certiorari* were:

> (1) Did the Court of Special Appeals and MSCBA misconstrue the COMAR definition of a "Procurement Contract" and thereby erroneously conclude that Faddis lacked standing to pursue its separate claims against the Maryland State Highway Administration ("SHA")?
>
> (2) Did the Court of Special Appeals and MSCBA improperly conclude that "untimely notice" was a jurisdictional bar to Brawner's and Faddis'[s] claims rather than an affirmative defense, subject to the doctrine of equitable estoppel?
>
> (3) Did the Court of Special Appeals and MSCBA err when they decide [sic] issues of material fact regarding Brawner's "notice" and the factual issue of the existence of a contract between Faddis and SHA by disregarding SHA's admissions that claims were pending, would be responded to and that an administrative process was ongoing?

14

531, 537 (2019) (quoting *Comptroller of Treasury v. Science Applications Int'l Corp.*, 405 Md. 185, 192 (2008)). "Thus, our inquiry 'is not whether the Court of Special Appeals erred, but whether the administrative agency erred.'" *Frederick Classical Charter Sch., Inc. v. Frederick Cty. Bd. of Educ.*, 454 Md. 330, 369 (2017) (quoting *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 523 (2004)).

In this case, the agency decision subject to appellate review is an MSBCA order granting summary disposition in SHA's favor. It is well-settled that the propriety of granting a motion for summary disposition is a legal question which we review *de novo*. *See, e.g.*, *Rosello v. Zurich American Ins. Co.*, 468 Md. 92, 102 (2020). Consequently, we must step into the shoes of the MSBCA and determine whether summary disposition was proper under COMAR 21.10.05.06. The legal standard for granting summary disposition is the same as that for granting summary judgment under Maryland Rule 2-501(a). That is, summary disposition is appropriate if "there is no genuine issue of material fact[,] and [a] party is entitled to prevail as a matter of law." COMAR 21.10.05.06D(2)(a), (b).

Even where there are alleged factual disputes, if the factual disputes are irrelevant, they will not prevent the entry of summary judgment. *Seaboard Sur. Co. v. Richard F. Kline, Inc.*, 91 Md. App. 236, 244 (1992). Moreover, once a movant has met its burden of demonstrating sufficient grounds for summary judgment, "[t]he party opposing summary judgment must do more than show simply that there is some metaphysical doubt as to the material facts." *Tyler v. City of College Park*, 415 Md. 475, 498 (2010) (internal quotations and citation omitted). To defeat a properly supported motion for summary judgment,

therefore, the non-moving party must produce admissible evidence demonstrating a dispute. *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737 (1993).

## III.

## Discussion

The crux of this dispute is whether Faddis had a procurement contract with the State. As the Court of Special Appeals aptly observed, "[u]ntil late in the game," Faddis accepted the proposition that it did not have a direct contract with the State. *Brawner Builders*, 248 Md. App. at 657. Indeed, its whole premise in the federal lawsuit was that Brawner's refusal to make a claim on Faddis's behalf precluded Faddis from recovering its losses. With the federal lawsuit (and undisclosed settlement with Brawner) in the rearview mirror, Faddis now asserts that it is a procurement contractor by virtue of SHA's pre-approval and certification of its plant, and therefore, it has the requisite standing to make a contract claim in its own right.

Of course, the reason that Faddis is asserting that it is a procurement contractor is to avoid the State's sovereign immunity. Prior to 1976, under common law, the State possessed sovereign immunity from contract actions filed against it. *See Katz v. Washington Suburban Sanitary Comm'n*, 284 Md. 503, 507 (1979) ("[T]he doctrine of sovereign immunity from suit, rooted in the ancient common law, is firmly embedded in the law of Maryland[]" and "is applicable not only to the State itself, but also to its agencies

16

and instrumentalities, unless the General Assembly has waived the immunity either directly or by necessary implication.").

As noted by our colleagues on the Court of Special Appeals, "[t]hat immunity was partially, and somewhat indirectly, waived by statute in 1976." *Brawner Builders*, 248 Md. at 658. That waiver, currently codified in Maryland Code, State Government Article ("SG") § 12-201, precludes the State and its officers, and units from raising the defense of sovereign immunity "in a contract action, in a court of the State, based on a written contract that an official or an employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee." We have previously held that waivers of sovereign immunity, which are in derogation of common law, are strictly construed in favor of the State. *Proctor v. Washington Metro. Area Transit Auth.*, 412 Md. 691, 709 (2010); *Bd. of. Educ. of Balt. Cty. v. Zimmer-Rubert*, 409 Md. 200, 212 (2009).

In connection with the limited waiver of immunity for contract claims pursuant to SG § 12-201, the Legislature has enacted a comprehensive set of laws governing procurement contracts, which are codified in Title 11 through Title 19 of the State Finance and Procurement Article ("SF"). While this comprehensive set of laws governs virtually every aspect of procurement contracting, here, we are principally concerned with SF Titles

17

11, 13, and 15, which deal with the process for entering into procurement contracts, as well as the structure and procedure for resolving procurement disputes.

*Procurement Contracting: Formation and Dispute Resolution*

Because this case implicates the General Assembly's prescribed method of procurement contract formation and dispute resolution, we begin our discussion with a brief overview of the procurement process. To understand this process, however, it is first necessary to understand a few key terms—namely, "procurement," "procurement contract," and "contract claim"—as these terms "shape the universe we are dealing with[.]" *Brawner Builders*, 248 Md. App. at 659. The first of these terms, "procurement," is defined as "the process of . . . buying or otherwise obtaining supplies, services, construction, construction related services, architectural services [or] engineering services[]" and includes "the solicitation and award of procurement contracts and all phases of procurement contract administration." SF § 11-101(n). The second key term, "procurement contract," is simply defined as "an agreement in any form entered into by a unit for procurement." SF § 11-101(o)(1). The final salient term is "contract claim," which SF§ 15-215(b) defines as "a claim that relates to a procurement contract[,]" including claims "about the performance, breach, modification, or termination of the procurement contract."

The procurement process begins with the procurement officer—the individual authorized by an agency to enter, administer, and make determinations and findings with

respect to procurement contracts—who selects a procurement method[7] and solicits bids for procurement. SF § 11-101(p) (defining "procurement officer"); SF § 13-102 (permitting procurement officer to solicit bids). After securing and reviewing qualifying bids and obtaining any approval required by law, the procurement officer may award the procurement contract to a qualified bidder. *See* SF §§ 13-103 through 13-113. The final agreement must contain certain contract provisions, including those related to termination, excuses for nonperformance, and liquidated damages. SF § 13-218(a); COMAR 21.07.01.01 through 21.07.01.30. Failure to either comply with the statutorily prescribed process for procurement contracting or include mandatory contract terms or provisions results in a contract that is either void or voidable. SF § 11-204; COMAR 21.03.01.01 through 21.03.01.03.

Recognizing that all does not always go as planned in the world of State procurement, the General Assembly created a process for resolving procurement disputes. This process begins when a procurement contractor[8] files a contract claim with the

---

[7] At all times relevant to this case, procurement officers were required to use a competitive sealed bidding process when soliciting, reviewing, and awarding bids on State projects unless "specifically . . . authorized" to employ an alternative procurement method. Md. Code (2001 Repl. Vol.), SF § 13-102(a). This changed in 2017, when the General Assembly amended SF § 13-102 to provide procurement officers with discretion to select a procurement method from a list of ten authorized procurement methods. *See* 2017 Md. Laws 3483–84.

[8] The parties appear to agree that only the person to whom a procurement contract has been awarded may submit a contract claim. Similarly, the parties also appear to accept the MSBCA's decision in *Jorge Co.*, MSBCA No. 1339 (1982). In that case, the MSBCA held a subcontractor that does not have a contract with a State agency cannot maintain an action in its own name and must instead submit all claims through the entity with whom

procurement officer. SF § 15-217. Notably, the filing of a contract claim generally proceeds in two steps. First, the contractor files a written notice of claim with the procurement officer "within 30 days after the basis for the claim is known or should have been known." SF § 15-219(a). After filing a general notice of claim, the contractor must submit "a written explanation that states: (1) the amount of the contract claim; (2) the facts on which the contract claim is based; and (3) all relevant data and correspondence that may substantiate the contract claim." SF § 15-219(b). This written explanation must be filed no more than 90 days after the contractor submits the notice of claim. *Id.* In the event that a procurement contractor fails to meet the applicable filing deadlines, the claim must be dismissed. COMAR 21.10.04.02.

Once a contract claim is filed, the agency has a fixed amount of time, depending on the amount of the claim, to investigate and issue a final decision. SF § 15-219(d). If an agency issues an unfavorable decision, a contractor may appeal to the MSBCA, though such an appeal must be filed within 30 days of the agency issuing the final decision. SF § 15-220. In the event that an agency fails to timely issue a decision on a pending claim, a contractor may treat such silence as a decision not to pay the contract claim and appeal such decision to the MSBCA. SF § 15-219(g).

*The Parties' Contentions*

Brawner and Faddis argue that the MSBCA erred in concluding Faddis was not a procurement contractor and therefore lacked standing to file a direct claim against SHA.

_____

the State has a direct contractual relationship. Because the parties do not dispute either issue, we assume, without deciding, that the parties' assumptions are correct.

According to Brawner and Faddis, a procurement contract is "an agreement in any form entered into by a procurement agency for . . . the acquisition of services, construction, construction-related services, or engineering services." (Internal quotations and emphasis omitted). Based on this definition, Brawner and Faddis contend that SHA's "written approval of Faddis'[s] engineered 'concrete mix designs[,]' structural engineering of the noise wall panels and posts[,] . . . and acceptance of Faddis'[s] quality control/quality assurance plan" constituted a procurement contract. To the extent it is unclear if Faddis had a direct contractual relationship with SHA, Brawner and Faddis argue such a determination is an issue of fact that is inappropriately resolved at the summary disposition stage.

Proceeding from the premise that Faddis had a valid procurement contract with SHA, Brawner and Faddis assert sovereign immunity is no bar to Faddis's claims. Specifically, Brawner and Faddis argue that the General Assembly "either directly or by necessary implication" waived the State's sovereign immunity with respect to procurement contract claims by enacting the State Finance and Procurement Article, as such enactment established a process for resolving procurement disputes between contractors and State agencies. It follows that because Faddis had a valid, written[9] procurement agreement with SHA, sovereign immunity should be no bar to Faddis's claims against SHA.

_____

[9] Although Brawner and Faddis assert the SHA-Faddis procurement contract is set forth in "multiple documents," these documents appear nowhere in the administrative agency record. Instead, the record includes no more than a blank print out of the standardized plant inspection checklist and a PDF print out indicating Faddis's status as a pre-approved supplier of noise barriers.

21

Brawner and Faddis also assert that the MSBCA erred in finding that Brawner failed to timely file a notice of claim on Faddis's behalf. According to Brawner, knowledge is a factual issue. And because it is generally inappropriate for disputed questions of fact to be determined on summary disposition, it was inappropriate for the MSBCA to conclude Brawner failed to timely file a notice of claim on Faddis's behalf. In the alternative, Brawner and Faddis argue that even if it was appropriate for the MSBCA to make factual determinations with respect to knowledge at the summary disposition stage, summary disposition was still inappropriate because Brawner and Faddis squarely raised the issue of equitable estoppel. Because equitable estoppel is an inherently fact-specific inquiry, Brawner and Faddis contend the MSBCA was precluded from resolving the issue without a full hearing on the merits.

Of course, SHA disagrees with arguments advanced by Brawner and Faddis. According to SHA, the MSBCA did not err in summarily entering judgment in SHA's favor because SHA was immune from Faddis's claims. With respect to contract claims, SHA asserts that sovereign immunity is only waived where there is a written contract. It follows that because there was no written agreement signed by an authorized procurement officer memorializing Faddis's status as a pre-approved concrete barrier supplier, any claims related to such relationship would fall outside the State's limited waiver of sovereign immunity.

In the event sovereign immunity is no bar to Faddis's claims, SHA asserts that designating Faddis a certified supplier of noise barriers did not constitute a procurement contract. As such, it is SHA's position that Faddis lacked standing to file a direct claim

22

against SHA and any claims Faddis had against SHA needed to timely pass through Brawner.

While SHA concedes that Brawner eventually passed through Faddis's claims to SHA, SHA asserts the pass-through claim was untimely. According to SHA, the undisputed evidence indicates Brawner knew of Faddis's claim by June 23, 2014. It follows that, because Brawner did not pass through a notice of claim on Faddis's behalf until August 11, 2015, Faddis's claims were untimely, and dismissal was required. Importantly, SHA rejects Faddis's assertion that Brawner's May 8 letter served as a notice of claim, observing that the plain language of Brawner's letter shows it did nothing more than reserve Brawner's right to file a claim should it become necessary. SHA also asserts that, even if the May 8 or June 23 letters served as notice of Faddis's claim, summary disposition was still appropriate because Brawner did not file a written explanation of Faddis's claims within 90 days of filing a notice of claim.

### A.    *There is No Procurement Contract Between Faddis and SHA*

We agree with SHA that its certification of Faddis as a pre-approved supplier of noise panels did not constitute a procurement contract. Starting with the plain language of the State Procurement Article, as noted above, an agreement is only a procurement contract to the extent the agreement is "entered into by a [State agency] for procurement." SF § 11-101(o)(1). It follows that a procurement contract only exists where the State contracts to "buy[] or otherwise obtain[] supplies, services, construction, construction related services, architectural services, [or] engineering services[.]" SF § 11-101(n) (defining

23

"procurement"). SHA procured nothing by certifying Faddis as a pre-approved supplier of noise barriers.

As the intermediate appellate court succinctly observed, "[p]re-approval of *eligibility* to provide materials, work, or services does not . . . constitute a contract to do so." *Brawner Builders*, 248 Md. App. at 662 (emphasis in original). We can say it no better. "Pre-approval of an entity's status or products—of eligibility to act as a supplier or even a preferred supplier—does not make the entity a procurement contractor if it is not, in fact, selected by a procurement agency, through a written contract, to provide materials, work, or services to the agency." *Id.* As the MSBCA correctly observed, being on an approved supplier list did not obligate SHA to "buy one single piece" of panel from Faddis, or to engage Faddis in any capacity on any project in the State. Nor did the certification require that any general contractor purchase from Faddis. The only status granted to Faddis through the pre-approved certification, was to permit Faddis to furnish its panels to other contractors, in the same manner as other certified suppliers on the list.

Under Faddis's argument, individuals and companies on any other state certified list would qualify as "procurement contractors" with authority to bring direct contract claims against the State and other agencies. For example, the State maintains a certified list of small businesses eligible for preferences under the Small Business Preference Program, *see* SF Title 14, Subtitle 2 and COMAR 21.11.01, as well as a certified list of minority businesses eligible for participation in the Minority Business Enterprise Program, *see* SF Title 14, Subtitle 3 and COMAR 21.11.03. Under Faddis's theory, any company or person identified on a certified list as being *eligible* under one of these programs, would have a

24

procurement contract with the State, simply by virtue of its eligibility. When asked about these other types of certified lists at oral argument, counsel for Faddis simply asserted that the relationship is "different" and that the certification process for plant approval is a "completely different process than that which would be used for [a] disadvantaged business enterprise." Although we agree that the approval process for becoming a pre-certified supplier of noise barriers is certainly different from other certifications, we fail to see why one type of pre-approval constitutes a "procurement contract," but others do not. Simply put, being an approved supplier of concrete panels does not create a procurement contract with SHA any more than being on an approved list of minority business enterprises creates a procurement contract with the Department of Transportation.

SHA, in pre-approving Faddis as a certified noise-barrier supplier, was engaged in neither buying nor otherwise obtaining anything from Faddis. To the contrary, SHA's certification of Faddis simply conferred upon Faddis eligibility for selection—either by SHA or a third party—as a supplier of noise barriers for future SHA projects. It should go without saying that the eligibility to supply products or services is different than actual selection as the source for supplies or services on a particular project.

That SHA's certification of Faddis as a pre-approved supplier of noise barriers is not a procurement contract finds additional support in the fact that SHA vests the ultimate decision to certify noise barrier manufacturers in someone other than a procurement officer. As previously noted, there is a clear process through which State agencies enter into procurement contracts. It begins with a procurement officer who solicits, evaluates, and, where appropriate, awards procurement contracts. *See* SF §§ 11-101(p), 13-102, 13-103

25

through 13-113. There is nothing in the record to reflect that SHA engaged in the procurement process when undertaking the plant certification process.

In a similar vein, we also observe that the written documentation alleged by Faddis to constitute a procurement contract lacked many of the standard terms and provisions agencies are required by law to include in procurement contracts. As noted above, the State Finance and Procurement Article and its implementing regulations require State procurement contracts to include a handful of standardized terms. *See* SF § 13-218(a); COMAR 21.07.01.01 through 21.07.01.30. Notwithstanding this clear directive, the "multiple documents" Faddis produces to prove the existence of a procurement contract with SHA lack many—if not all—of these mandatory provisions.

We determine that Faddis's status as a certified noise barrier supplier lacked all the requisite requirements to fall within the statutory definition of a procurement contract. By certifying the plant for *eligibility* for SHA contracts *generally*, SHA did not enter into a procurement contract to purchase the panels, or otherwise transform an eligible supplier into a prime contractor.

### B. The Pass-Through Claim Submitted by Brawner on Faddis's Behalf Was Untimely

We similarly reject Faddis's and Brawner's assertion that Brawner timely filed a pass-through notice of claim against SHA on Faddis's behalf. As previously discussed, the State Finance and Procurement Article provides that a party seeking administrative review on a procurement contract claim must "file a written notice of a claim . . . within 30 days after the basis for the claim is known or should have been known." SF § 15-219(a).

26

After filing a notice of claim, a contractor is required to submit "a written explanation that states[] (1) the amount of the contract claim; (2) the facts on which the contract claim is based; and (3) all relevant data and correspondence that may substantiate the contract claim." SF § 15-219(b). This written explanation must be filed within 90 days of filing the notice of claim. *Id.* In the event the applicable filing deadlines go unmet, the claim must be dismissed. COMAR 21.10.04.02.[10]

The record reveals that on June 23, 2014, Faddis authored a letter advising Brawner, in general terms, that Faddis incurred damages due to SHA's conduct and requesting Brawner forward the letter to SHA to advise SHA of damages incurred by Faddis. As the Court of Special Appeals aptly observed, this letter effectively "shows the latest date when Faddis and Brawner both were aware that Faddis had a claim that needed to be presented" to SHA by Brawner. *Brawner Builders*, 248 Md. App. at 663–64.

It follows that, in order for Faddis's claim to be timely, Brawner needed to pass through notice of Faddis's claim to SHA within 30 days of June 23, 2014. That did not happen. Instead, Brawner did not pass Faddis's claim through to SHA until August 11, 2015, when Brawner sent a letter to SHA advising SHA that Faddis filed suit against Brawner in federal court.

Our conclusion that Brawner did not timely pass through Faddis's claim against SHA finds support in Faddis's own words. Specifically, on July 16, 2015, Faddis filed a federal complaint against Brawner, wherein Faddis alleged harm due to Brawner's refusal

---

[10] Neither party disputes that the filing deadlines apply to pass-through claims.

to facilitate the pursuit of Faddis's claims against SHA. Stated differently, the federal complaint was premised on Brawner's failure to pass through Faddis's claims against SHA. We agree with the Court of Special Appeals that "[t]here can be no clearer admission that, as of [July 16, 2015], no written pass-through notice of claim had been filed by Brawner on behalf of Faddis." *Id.* at 664.

In reaching our conclusion that notice of Faddis's claim was untimely filed, we reject Faddis's claim that Brawner's May 8, 2014 letter to SHA constituted a notice of claim, as such a conclusion is inconsistent with the plain language of the May 8 letter. As previously noted, Brawner sent SHA a letter on May 8 to respond to SHA concerns related to Faddis's Downington facility. Though it is true that this letter advised SHA that Brawner and Faddis had been harmed by SHA's conduct and that they were reserving their rights to extended contract duration and compensation, the letter did not advise SHA that either Faddis or Brawner were requesting any relief at the time. To the contrary, Brawner's letter stated that they were instead reserving their "right to do so should it become necessary." In other words, the May 8 letter did the opposite of what Faddis contends—it notified SHA that Faddis and Brawner did *not* have any claims against SHA at that time.

Finally, Brawner and Faddis argue that it was inappropriate for the MSBCA to conclude that Faddis failed to provide timely notice of its claims against SHA without a full hearing on the merits. Relying on this Court's decision in *Engineering Management Services v. Maryland State Highway Administration*, 375 Md. 211 (2003), Faddis and Brawner assert that summary disposition is inappropriate whenever resolution of a contested issue involves factual determinations related to knowledge, motive, or intent.

28

Specifically, they contend that, because the timeliness of notice under SF § 15-219(a) turns on when a would-be contract claimant knows or should have known of a claim, the issue should only be resolved after a full hearing on the merits rather than summary disposition. Even if this is not the case, Brawner and Faddis argue our decision in *Engineering Management Services* still precludes summary disposition in this case because summary disposition is inappropriate where a party opposing summary disposition "squarely raise[s] the issue of 'equitable estoppel' respecting the issue of 'notice[.]'" Specifically, Faddis and Brawner argue that discovery conducted in connection with Faddis's federal lawsuit, as well as correspondence between SHA, Faddis, and Brawner established that SHA had notice of Faddis's claim and was acting on it. We find both arguments unpersuasive.

Our decision in *Engineering Management Services* simply restates the general rule that it is often inappropriate to grant summary disposition where there are factual issues related to knowledge, motive, or intent because such issues may require "greater than usual factual development[.]" *Berkey v. Delia*, 287 Md. 302, 306 (1980). But this general rule is not absolute, as we have oft observed summary judgment may be appropriate notwithstanding the presence of factual issues concerning knowledge, motive, or intent so long as there are "no genuine issue[s] of material fact," *id.*, and the facts are not susceptible "to inferences supporting the position of the party opposing summary judgment[.]" *Clea v. Mayor and City Council of Balt.*, 312 Md. 662, 677 (1988). Thus, where, as here, there are no genuine disputes of material fact with respect to whether or when Faddis had knowledge of a claim against SHA, we find no error in the MSBCA's decision to resolve the dispute via summary disposition.

29

Turning to Brawner's second argument, we begin by observing that equitable estoppel is not a procedural panacea that spares all litigants who utter the phrase from summary disposition. To the contrary, equitable estoppel, like factual determinations related to knowledge, intent, or motive, is a factual matter, the resolution of which should generally follow a full hearing on the merits. This does not mean, however, that summary disposition is precluded in every instance that a party raises equitable estoppel. Indeed, just as summary disposition may be appropriate on issues related to knowledge, motive, or intent where there are neither any disputes as to material facts nor facts susceptible to inferences supporting the party opposing summary judgment, so too may summary disposition be appropriate in matters involving equitable estoppel as long as material facts are not in genuine dispute and such facts are not susceptible to inferences drawn in favor of the party opposing summary disposition.

We find this case falls into the exception to the general rule and therefore, the MSBCA did not err in resolving this case on summary disposition notwithstanding the presence of arguments related to equitable estoppel. Brawner's equitable estoppel argument makes much ado about an SHA email, dated June 19, 2014, wherein a SHA employee indicated Faddis and SHA were "currently engaged[]" in "an administrative dispute process[.]" This admission, Brawner and Faddis suggest, indicates SHA had effectively waived any notice requirements with respect to Faddis's claims against SHA. We disagree for two reasons: first, Faddis's conduct in the days following the June 19 email contradict Faddis's equitable estoppel narrative. Specifically, on June 23, 2014, Faddis wrote to Brawner requesting that Brawner produce a copy of the notice of claim sent to

30

SHA and wrote separately to SHA with a letter intended to serve as Faddis's notice of claim. There would have been no need for Faddis to send the June 23 letters if Faddis had indeed relied on statements made in the June 19 email. Second, Faddis's equitable estoppel argument appears to confuse two separate SHA administrative dispute processes: the ad hoc SHA process for handling plant certification disputes and the formal SHA process for handling procurement contract disputes. A review of the correspondence reveals that while it may be true that the June 19 email referenced "an administrative dispute process," the email's context clearly indicates that SHA was simply referring to a dispute resolution process pertaining to plant certification. Thus, the June 19 email does not indicate SHA had effectively waived any notice requirements with respect to Faddis's claims against SHA.

Brawner's equitable estoppel argument also relies heavily on internal SHA emails and documents concerning Faddis, which were uncovered by Faddis during discovery in the federal lawsuit. These documents have no bearing on the issue of equitable estoppel. Indeed, equitable estoppel turns on what Faddis knew and relied on in 2014, not what Faddis happened to learn after the fact through discovery in federal litigation.

## IV.

### Conclusion

We find no error in the MSBCA's decision to grant SHA's motion for summary decision. We agree with the MSBCA's determination that SHA's certifying Faddis as a pre-approved supplier of noise barriers did not constitute a procurement contract, and Faddis was therefore precluded from pursuing claims against SHA unless and until

31

Brawner timely passed Faddis's claims through to SHA. The undisputed facts show Brawner failed to timely file notice of claim on Faddis's behalf, and thus, the MSBCA properly dismissed Faddis's claims and entered judgment in SHA's favor.

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF JUDGMENT AFFIRMING THE DECISION OF THE MARYLAND STATE BOARD OF CONTRACT APPEALS. COSTS TO BE PAID BY PETITIONERS.**